FILED

APR 2 1 2005 NR

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ROBERT HUNT, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| ELAN CORPORATION, plc, G. KELLY MARTIN, LARS EKMAN and SHANE COOKE, | ) ) ) ) |
| Defendants. | ) ) ) |

Case No. **05C 2367**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**JUDGE FILIP**

MAGISTRATE JUDGE ASHMAN

Plaintiff Robert Hunt, individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, announcements made by the defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Elan Corporation, plc ("Elan" or the "Company") securities analysts' reports and advisories about the Company, and other publicly available information.

**NATURE OF THE ACTION**

1.     This is a federal class action on behalf of purchasers of the publicly traded securities of Elan between January 29, 2004 and March 30, 2005, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

-1-

2.     Elan, an Irish public limited company, is a neuroscience-based biotechnology company headquartered in Dublin, Ireland, which focuses on discovering, developing, manufacturing and marketing advanced therapies in autoimmune diseases, including pain, and neurodegenerative diseases.

3.     Specifically, Elan, in collaboration with Biogen Idec, Inc. ("Biogen"), developed and marketed Tysarbi®, formerly referred to as Antegren, for treatment of a wide range of autoimmune diseases, including multiple sclerosis ("MS"), Crohn's disease, and rheumatoid arthritis. This complaint arises from the defendants' false and misleading statements and omissions concerning the safety of Tysarbi® for use in the treatment of multiple sclerosis.

4.     In November 2004, the Food and Drug Administration ("FDA") granted accelerated approval of Tysarbi® for the treatment of MS, after completion of only one year of two ongoing two-year clinical trials of the drug. Because the FDA approved Tysarbi® on such an expedited, and incomplete, basis, the Defendants had an increased duty to monitor for potential side effects. Despite this heightened duty, at all times during the Class Period, defendants knew or recklessly disregarded and failed to disclose the following: (a) animal and human studies of Tysarbi® showing a heightened risk of adverse effects resulting from suppression of the immune system; (b) clinical trials of Tysarbi® and Tysarbi® in combination with Biogen's existing MS drug, Avonex, that failed to include the full range of medical tests required to detect the type of adverse side effects likely to result from extended treatment with Tysarbi®, including Progressive Multifocal Luekoencephalopathy ("PML"), a frequently fatal disease of the central nervous system; and (c) the potentially fatal cumulative side effects of Tysarbi®, such that there was a significant possibility that they would not become apparent after

-2-

only a year or even two years of clinical trials.

5.    On February 28, 2005, although having knowledge of a serious illness associated with the trials at least as early as February 7, 2005, Defendants disclosed to the investing public that two trial subjects had contracted PML, that one of them had died of the disease, and that Tysarbi® was likely the cause. This news was catastrophic. At the close of trading in Dublin on February 28, 2005, Elan common stock fell €13.81 per share, or 68%, to €6.49. In the United States, Eland ADRs (American Depository Receipts) lost 70% of their value, on a trading volume of 165,358,896 shares, between the close of business on February 25, 2005 and the announcement on February 28th, following to a low $7.90 before closing the day at $8.00. Together, Elan and Biogen lost more than $17 billion in market capitalization after the announcement. The magnitude of this market drop is overwhelming evidence of the materiality of the information disclosed, the importance of which itself raises the strong inference of recklessness, if not actual knowledge of the previously undisclosed condition of the two trial subjects and the dangers of extended Tysarbi® treatments.

6.    On March 4, 2005, the law firm of Johnson & Perkins ("J&P") published a news release in which it announced that it was commencing a federal securities class action lawsuit on behalf of purchasers of Elan securities between February 18, 2004 and February 25, 2005 arising from Elan and Biogen's disclosures with respect to the Tysarbi® trials. J&P also announced that such purchasers had until May 3, 2005 to move for appointment as lead plaintiff of the action. This related complaint, which contains additional allegations, is being filed to meet the May 3, 2005 deadline for filing motions for appointment as lead plaintiff, and, consistent with a primary purpose of the Private Securities Reform Act of 1995 ("PSLRA"), to increase the likelihood of

highly motivated investors stepping forward to lead the class.

## JURISDICTION AND VENUE

7.      This claims herein arise under Sections 10(b) and 20(a) of the Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.

8.      This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this district pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 (b).  Many of the acts charged herein, including the dissemination of materially false and misleading information in connection with the sale of a security, occurred in this judicial district.

10.     In connection with the acts, conduct and other wrongs alleged in this complaint, the defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the New York Stock Exchange.

## PARTIES

11.     Plaintiff Robert Hunt, as set forth in the accompanying certification, incorporated by reference herein, purchased Elan ADRs at artificially inflated prices during the Class Period, and were damaged thereby.

12.     Defendant Elan is a public limited company incorporated under the laws of Ireland with its principal executive offices located at Lincoln House, Lincoln Place, Dublin 2, Ireland.  Elan also maintains a facility at 225 Franklin Street, Floor 26, Boston, Massachusetts.

-4-

Elan common shares trade on the London and Dublin Stock Exchange and in the form of ADRs on the New York Stock Exchange.

13.     Defendant G. Kelly Martin ("Martin") was at all relevant times Elan's Chief Executive Officer.

14.     Defendant Shane M. Cooke ("Cooke") was at all relevant times Elan's Chief Financial Officer.

15.     Defendant Lars Ekman was at all relevant times Elan's Executive Vice-President and President, Global Research & Development and Corporate Strategy.

16.     Defendants Martin, Cooke and Ekman are collectively referred to herein as "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Elan's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this class action under Rules 23(a) and 23(b)(3) of the Federal

Rules of Civil Procedure, on behalf of a class of persons who purchased or otherwise acquired

Elan securities during the Class Period (or their successors in interest) ("the Class"). Excluded

from the class are defendants, the officers and directors of the Company, at all relevant times,

members of their immediate families and their legal representatives, heirs, successors or assigns

of any entity in which defendants have or had a controlling interest or which is related to or

affiliated with any of the defendants.

18.     The members of the class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Elan's securities were actively traded on the Dublin

and London exchanges and on the NYSE as ADRs. As of November 5, 2004, Elan had more

than 386,182,274 ordinary shares of common stock issued and outstanding. While the exact

number of Class members is unknown to Plaintiff at this time and can only be ascertained

through appropriate discovery, Plaintiff believes that there are thousands of members in the

proposed Class. Record owners and other members of the Class may be identified from records

maintained by Elan or its transfer agent and may be notified of the pendency of this action by

mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by defendants' wrongful conduct in violation of

federal law that is complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

      (b)     whether defendants' publicly disseminated releases and statements during the Class period omitted and/or misrepresented material facts and whether defendants breached any duty to convey material facts or to correct material facts previously disseminated;

      (c)     whether defendants acted with scienter in omitting and/or misrepresenting material facts;

      (d)     whether defendants participated in and pursued the common course of conduct complained of herein;

      (e)     whether the price of Elan securities was artificially inflated during the Class Period as a result of the material misrepresentations and omissions complained of herein;

      (f)     whether Martin, Cooke and Ekman were controlling persons as alleged herein; and

      (g)     whether members of the Class have sustained damages and, if so, the proper measures of such damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this as a class action.

## SUBSTANTIVE CLASS ALLEGATIONS

23.     Tysarbi®, the first humanized monoclonal antibody approved for the treatment of MS, inhibits adhesion molecules on the surface of immune cells. Research suggests Tysarbi® works by preventing immune cells from migrating from the bloodstream into the brain where they can cause inflammation and potentially damage nerve fibers and their insulation. In the early 1990's, animal studies showed dangers in using Tysarbi®. This caused some doctors to clinicians to conclude that it was too risky for further testing in humans.

24.     Biogen and Elan collaborated equally on the development of Tysarbi® in MS, Crohn's disease and rheumatoid arthritis. Regulatory authorities in Canada and Australia have designated Tysarbi® for Priority Review as a treatment for MS and the European Union Medicines Agency ("EMEA") is actively reviewing the application. The United States' FDA granted accelerated approval of Tysarbi® for the treatment of MS, after completion of only one year of two ongoing two-year clinical trials of the drug.

25.     MS is a degenerative neurological disease characterized by recurrent episodes of inflammation in the white matter of the central nervous system ("CNS"). This inflammation destroys the myelin sheath or covering of the nerve cells, leaving multiple areas of scar tissue and adversely affecting the central nervous system. In addition, MS debilitates muscle coordination and balance, and can lead to impaired vision, and potentially paralysis. MS is the most common

neurological autoimmune disease among young adults of European descent; approximately one million people are thought to be affected worldwide. Scientists have been unable to determine the cause of MS.

26.     Elan's Tysarbi® was meant to be a miracle drug in more ways than one. Elan had gotten into financial troubles based upon its creative accounting methodologies of shifting research and development costs, showing them as revenues long before they actually developed any product. This creation of "half-truths" resulted in civil actions by the SEC and shareholders, which Elan eventually settled for $105 million. After its divestiture, the company reorganized itself with Tysarbi® being the essential to the success of Elan's recovery, and the success of its CEO, Martin.

27.     In May 2004, after only two years of Phase III trial and one year of data, Elan and Biogen submitted Antegren to the FDA and European regulatory agencies for approval to market it as a treatment for MS, even though no other MS therapy then on the market had been approved on the basis of lass than two years of data. The two studies were called AFFIRM (natalizumab safety and efficacy in relapsing-remitting MS) and SENTINEL (safety and efficacy of Tysarbi® in combination with Avonex). The AFFIRM study was purportedly designed to evaluate the ability of Antegren to slow the progression of disability in MS and reduce the rate of clinical relapses. The SENTINEL study was purportedly designed to evaluate the effect of the combination of Tysarbi® and Avonex compared to treatment with Avonex alone in slowing the progression of disability and reducing the rate of clinical relapses.

28.     Even though MS patients taking Tysarbi® are susceptible to PML (a disease which typically strikes persons with impaired immune systems, resulting in death within one to

four months) because Tysarbi® suppresses the immune system and PML results from such suppression, neither of the trial protocols included lumbar punctures, which are the only reliable way of detecting early-onset PML. Defendants failed to disclose this.

29.     Additionally, defendants failed to disclose that: (a) animal and human studies of Tysarbi® showed a significant risk of adverse effects resulting from suppression of the immune system; (b) clinical trials of Tysarbi® failed to include the full range of medical tests required to detect the type of adverse side effects likely to result from extended treatment with Tysarbi®, including PML; and (c) the adverse side effects of Tysarbi®, including PML, were cumulative such that there was a significant possibility that they would not become apparent after a year or even two years of clinical trials. Consequently, defendants' statements about Tysarbi® throughout the Class Period were materially false and misleading and defendants at all relevant times knew or recklessly disregarded that their statements were materially false and misleading.

### Materially False and Misleading
### Statements Issued During the Class Period

30.     The Class Period begins on January 29, 2004. On that date, the Companies issued a press release with the headline "Elan and Biogen Idec Announce ANTEGREN–Natalizumab– Phase III Maintenance Tiral in Crohn's Disease Met Its Primary Endpoint." Therein, Elan stated:

> DUBLIN, Ireland, CAMBRIDGE, Mass. & SAN DIEGO – (BUSINESS WIRE)– Jan. 29, 2004– Elan Corporation, plc and Biogen Idec today announced that the Phase III maintenance trial of ANTEGREN ® (natalizumab) in Crohn's disease met the primary endpoint of maintenance of response. Maintenance of response was defined by a sustained Crohn's Disease Activity Index (CDAI) score of less than 220 as well as no use of rescue intervention throughout 6 months of this study. There was a significant treatment difference of greater than 30 percent in favor of natalizumab in patients taking the drug compared to those taking placebo. No notable difference in

-10-

overall rates of side effects between natalizumab and placebo treatment groups was observed through month 6.

Elan and Biogen Idec, which are collaborating on the development, manufacturing and marketing of natalizumab, will discuss these data with regulatory authorities in both the U.S. and Europe and determine the appropriate path forward for natlizumab in Crohn's disease. The clinical development program for natalizumab in multiple sclerosis (MS) is ongoing, with more than 2,000 patients enrolled.

"We are extremely encouraged by these findings and are committed to the further development and evaluation of natlizumab in Crohn's disease," said Lars Ekman, MD, executive vice president and president, Research and Development, Elan.

"These natalizumab data also reinforce the importance of studying its novel mechanism of action in the treatment of other severe and chronic inflammatory diseases. We expect to share the date from this study at a major medical meeting in the first half of this year."

The Phase III, double-blind, placebo-controlled, international trial known as ENACT-2 (Evaluation of Natlizumab as Continuous Therapy-2) enrolled responders from ENACT-1 (a 3-month study in patients with very active Crohn's disease). These 428 patients from ENACT-1 were re-randomized after 3 moths to one of two treatment groups: natalizumab (300 mg) or placebo, both administered monthly for a total of 12 months. The primary endpoint was through month 6 of ENACT-2; additional analyses will be performed at other timepoints.

The safety profile seen in this trial is similar to that seen in previous natalizumab trials. The most frequently reported adverse events in either group in the first 6 months of the study were headache, nausea, and abdominal pain.

The Ongoing Clinical Development Program for Natalizumab

Concurrently, two Phase II studies in multiple sclerosis (MS) are underway. AFFIRM (natalizumab safety and efficacy in relapsing-remitting MS) will evaluate the ability of natalizumab to slow the rate of disability in MS and reduce the rate of clinical relapse; SENTINEL (safety and efficacy of natlizumab in combination with AVONEX ® (Interferon beta-1a) in patients with relapsing-remitting MS) will

determine if the combination of natalizumba and AVONEX is more effective than treatment with AVONEX alone in slowing rate of disability and reducing rate of clinical relapse.

"We are confident in the potential of natalizumab as a therapeutic option for patients with chronic immunologic diseases," said Burt Adelman, MD, executive vice president, Development, Biogen IDEC. "We look forward to working with the regulatory agencies to determine the next steps."

31.     On February 18, 2004, defendants issued a press release over the *Business Wire*

under the headline, "Biogen Idec and Elan Announce Intention to Submit ANTEGREN ® for

approval for Multiple Sclerosis Based on One-Year Data." In relevant part, Elan stated as

follows:

> CAMBRIDGE, Mass. & SAN DIEGO & DUBLIN, Ireland – (BUSINESS WIRE) – Feb. 18, 2004 – Biogen Idec and Elan Corporation, plc today announced that they expect to submit to the U.S. Food and Drug Administration (FDA) an application for approval of ANTEGREN ® (natalizumab) as a treatment for multiple sclerosis (MS). The companies expect to submit the filing mid-year 2004.
>
> The decision to file a Biologics License Application (BLA) was made after discussions with the FDA of one-year data from the two ongoing two-year Phase III trials in MS. The companies are committed to completing the two-year trials. To protect the integrity of the trials, the companies are not disclosing the one-year data at this time.
>
> Biogen Idec and Elan are collaborating equally on the development of natalizumab for MS, Crohn's disease, and rheumatoid arthritis.
>
> About the ANTEGREN MS Clinical Trials
>
> The AFFIRM (natalizumab safety and efficacy in relapsing-remitting MS) trial is a two-year, randomized, multi-center, placebo-controlled, double-blind study of approximately 900 patients, evaluating the ability of natlizumab to slow the progression of disability in MS and reduce the rate of clinical relapses. The SENTINEL (safety and efficacy of natalizumab in combination with AVONEX ® (Interferon

-12-

beta- 1a )) trial is a two-year, randomized, multi-center, placebo-controlled, double-blind study of approximately 1,200 patients with relapsing-remitting MS, evaluating the effect of the combination of natalizumab and AVONEX compared to treatment with AVONEX alone in slowing the progression of disability and reducing the rate of clinical relapses. Both studies have protocols that included a one-year analysis of the data. The primary endpoints for both Phase III two-year trials in MS are based on the Expanded Disability Status Scale (EDSS) and relapse rates. The pre-specified primary endpoint of one-year analysis was relapse rates.

About ANTEGREN (natalizumab)

Natalizumab, a humanized monoclonal antibody, is the first alpha-4 antagonist in the new SAM (selective adhesion molecule) inhibitor class. The drug was designed to selectively inhibit immune cells from leaving the bloodstream and to prevent these cells from migrating into chronically inflamed tissue as occurs in a variety of inflammatory diseases. To date, approximately 2,800 patients have received natalizumab in clinical studies. In previous clinical trials, the following adverse events occurred more commonly with natalizumab when compared to placebo: headache, nausea, abdominal pain, infection, urinary tract infection, pharyngitis and rash. Serious adverse events have included infrequent hypersensitivity-like reactions.

32.     Also on February 18, 2004, Elan issued a press release titled "Elan Reports Fourth Quarter 2003 and Full-Year Financial Results." Therein, the Company stated:

Elan demonstrated significant progress during the course of 2003 which provides a strong foundation upon which to build long term value for our shareholders. Our focus on execution and operating discipline has enabled us to simplify our balance sheet, increase liquidity and reduce our overall debt and operating costs while achieving continued revenue growth from retained products and services. Importantly, we never wavered from our commitment to invest in and develop our strategic pipeline within our key therapeutic areas of neurology, autoimmune and severe pain. The expected one-year filing for MS, the recent positive Phase III maintenance results in Antegren for Crohn's disease and the successful Phase II trial for Prialt confirms the potential for our world class science to reach those patients who suffer from theses diseases. Such execution momentum

-13-

is the result of focus, dedication and the extraordinary efforts of Elan employees around the world who remain dedicated to positioning us for success and working towards bring our scientific innovation to patients.

33. On this news, the price of Elan ADRs increased by 12% to a closing price of $8.80 on February 17, 2004 to a closing price of $13.33 on February 18, 2004. On June 28, 2004, Elan issued a news release under the headline, "FDA Designates Antegren Biologics License Application for Priority Review as a Treatment for Multiple Sclerosis; Application Under Accelerated Approval Guidelines." The release stated, in relevant part, as follows:

> CAMBRIDGE, Mass. & SAN DIEGO & DUBLIN, Ireland–(BUSINESS WIRE) – June 28, 2004 – Biogen Idec and Elan Corporation, plc announced today that the Biologics License Application (BLA) for ANTEGREN ® (natalizumab) has been designated for Priority Review and Accelerated Approval by the U.S. Food and Drug Administration (FDA) for the treatment of multiple sclerosis (MS). The next step in the process is action by the FDA on formal acceptance of the application, which occurs within 60 days of submission.

> The FDA grants Priority Review status to products that are considered to be potentially significant therapeutic advancements over existing therapies that address an unmet medical need. Based on the FDA's designation of Priority Review for natalizumab in MS, the companies anticipate action by the Agency approximately six months from the submission date, rather than the 10 months for a standard review. On May 25, 2004, the companies announced they had previously submitted BLA for the approval of natalizumab for MS.

> "We are pleased that the FDA has designated natalizumab for Priority Review," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "We look forward to continuing to work with the FDA throughout the review process to provide this potential new therapeutic to patients with MS."

> "The Priority Review designation underscores the significant unmet medical need in the area of Ms," said Lars Ekman, MD, executive vice president and president, Research and Development, Elan. "We

-14-

believe natalizumab will offer a new approach to treating MS and will bring hope to patients living with this disease."

The BLA for natalizumab is being evaluated by the FDA under Accelerated Approval guidelines. This review will be based on one-year data from two ongoing Phase III trials. The companies are committed to completing these two-year trials. In order to protect the integrity of the trials, the companies are not disclosing the one-year data at this time.

34.     On July 26, 2004, Elan issued a press release headlined "FDA Accepts Biologics License Application for ANTEGREN® for Multiple Sclerosis." The release stated, in relevant part, as follows:

> CAMBRIDGE, Mass. & SAN DIEGO & DUBLIN, Ireland– (BUSINESS WIRE) – July 26, 2004– Biogen Idec and Elan Corporation, plc announced today that the U.S. Food and Drug Administration (FDA) has formally accepted their Biologics License Application (BLA) for ANTEGREN® (natalizumab). In June 2004, the FDA designated natalizumab for Priority Review and Accelerated Approval for the treatment of multiple sclerosis (MS). Acceptance of a filing indicates that the FDA has determined that the application is complete and permits a substantive review.
>
> The FDA grants Priority Review status to products that are considered to be potentially significant therapeutic advancements over existing therapies that address an unmet medical need. Based on the FDA's designation of Priority Review for natalizumab in MS, the companies anticipate action by the Agency approximately six months from the submission date, rather than the 10 months for a standard review. On May 25, 2004, the companies announced they had previously submitted BLA for the approval of natalizumab for MS.
>
> The FDA's review of natalizumab will be based on one-year data from two ongoing Phase III trials, AFFIRM (natalizumab safety and efficacy in relapsing-remitting MS) and SENTINEL (safety and efficacy of natalizumab in combination with AVONEX® (Interferon beta- 1a)), which evaluate the ability of natalizumab to slow the progression of disability and reduce the rate of clinical relapses in patients with relapsing-remitting MS. The companies are committed

to completing these two-year trials.

35.     On October 28, 2004, the Company issued a news release over the *Business Wire* in which it attempted to offset the disclosure of continuing and widening net losses with positive statements about the prospects of ANTEGREN. Defendant Martin is quoted in the release as follows:

> All of our energies are focused on delivering our science to patients with unmet medical needs. Today, our emphasis on preparing for a successful launch of Antegren in multiple sclerosis exemplifies our commitment to bringing innovative therapies from the lab to patients around the world.

Defendant Cooke counteracted the poor financial reports with his optimism of Antegren:

> We continued to report net losses this quarter as we resolve outstanding legacy issues, streamline the balance sheet and, most importantly, invest for a successful launch of Antegren and Prialt. *We are optimistic that the dedication, commitment and financial resources we have invested in these products will be reflected n a return to profitability in the 2006 timeframe.* [Emphasis added]

36.     The statements had their desired effect and Elan shares rose another 3.2% to €20.28 on the Dublin Exchange.

37.     On November 8, 2004, Elan issued a press release over the *Business Wire* in which they announced that one-year data from the Phase II ANTEGREN ® (natalizumab) AFFIRM trial "met the primary endpoint of clinical relapse rate reduction" and that in the international study of 942 patients with relapsing-remitting multiple sclerosis (RRMS), Tysarbi® reduced the rate of relapses by 66% compared to placebo, a statistically significant result. The release stated in relevant part:

> "These data demonstrate that natalizumab dramatically reduced the rate of relapses at one year," said Burt Adelman, MD, executive vice

president, Development, Biogen Idec. "We believe natalizumab, with its novel mechanism of action, has the potential to be a significant step forward in the treatment of MS."

"Natalizumab has the potential to make a real difference in the lives fo MS patients," said Lars Ekman, executive vice president and president, Research and Development, Elan. "We are working closely with regulatory authorities to make natalizumab available to patients in need as soon as we can."

"This was a rigorous, well-conducted clinical trial across 99 sites worldwide that yielded compelling one-year results," said Chris Polman, MD, PhD, lead investigator of the AFFIRM study, professor of neurology at Free University Medical Centre, and clinical and scientific director of the Multiple Sclerosis Centre at the VU Medical Centre, Amsterdam. "These data suggest that natalizumab may become a promising new treatment option for patients with MS and could help address a significant unmet need."

38.     This announcement produced positive results in the investment community, as

evidence by a November 8, 2004 article in *Bloomberg Wire*, which stated:

Elan and Biogen are using the results to back their U.S. and European applications for the drug, which may enter the market that Lehman Brothers values at $5 billion. Biogen, the No. 3 U.S. biotechnology company, is looking to Antegren as growth slows in older medicines such as its top-selling Avonex MS drug. Elan needs a successful product to help return to profit after selling about $2 billion in assets to pay down debt.

"The data which came out this morning on Antegren were excellent," said Romain Pasche, who manages about $800 million in health care stocks at Vontobel Asset Management in Zurich. [...]

Elan shares jumped 1.30 euros, or 6.1 percent, to €22.50 at the close of trading in London [...]

The 66 percent reduction in relapses exceeds results from an earlier trial which showed Antegren cut the rate by 50 percent. Results also topped the 30 percent reduction rate of the interferon medicines, according to analysts, including Robert Brisbourne for Dublin-based Merrion Capital Group.

> The results "are very strong relative to existing treatments," Brisbourne said in an interview. "It supports accelerating review certainly." [...]

39. The statements set forth in ¶¶ 30-38 above were materially false and misleading (and defendants knew or recklessly disregarded that they were materially false and misleading), because they failed to disclose the following:

    (a)    animal and human studies of Tysarbi® showed a significant risk of adverse effects from suppression of the immune system;

    (b)    the clinical trials of Tysarbi® failed to include the full range of medical tests required to detect the type of adverse side effects likely to result from extended treatment with Tysarbi® , including PML; and

    (c)    the adverse side effects of Tysarbi®, including PML, were cumulative such that there was a significant possibility that they would not become apparent after a year or even two years of clinical trials.

40. To the extent that defendants' statements set forth above in ¶¶ 30-38 regarding the efficacy, safety and likely market success of Tysarbi® are deemed to be forward-looking, they are not protected by the safe harbor provisions of the Private Securities Litigation Reform Act ("PSLRA") because:

    (a)    Such statements were material to investors;

    (b)    Defendants had actual knowledge that such statements were false because, in light of the then-existing knowledge with respect to Tysarbi®, there was not reasonable basis for their statements that Elan's investment in Tysarbi® "will be reflected in a return to profitability in the 2006 timeframe";

(c)     Such statements were not accompanied by "meaningful cautionary language";

and

(d)     Defendants failed to identify studies containing information about Tysarbi®

that identified material risks that Elan omitted to disclose.

**The FDA Approves Tysarbi®**

41.     On November 23, 2004, Elan announced that the FDA had granted accelerated

approval of Tysarbi® in the press release headlined "FDA Grants Accelerated Approval of Tysarbi®

Formerly Antegren®, for the Treatment of Multiple Sclerosis." Therein, the Company stated:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today that the U.S. Food and Drug Administration (FDA) has approved TYSABRI® (natalizumab), formerly referred to as ANTEGREN®, as treatment for relapsing forms of multiple sclerosis (MS) to reduce the frequency of clinical relapses. FDA granted Accelerated Approval for TYSABRI following Priority Review based on one-year data from two Phase III studies, the AFFIRM monotherapy trial and the SENTINEL add-on trial with AVONEX® (interferon beta-la).
>
> TYSABRI, the first humanized monoclonal antibody approved for the treatment of MS, inhibits adhesion molecules on the surface of immune cells. Research suggests TYSABRI works by preventing immune cells from migrating from the bloodstream into the brain where they can cause inflammation and potentially damage nerve fibers and their insulation.
>
> "TYSABRI is a powerful and innovative therapy that offers new hope for hundreds of thousands of people living with MS," said James C. Mullen, chief executive officer, Biogen Idec. "We believe TYSABRI will revolutionize the treatment of MS and become the leading choice for patients and physicians."
>
> "TYSABRI is a significant breakthrough for patients with MS," said Kelly Martin, president and chief executive officer, Elan. "The approval of "TYSABRI, with its unique mechanism of action and new level of efficacy, has the potential to make a genuine difference

in the lives of patients and families who struggle with the debilitating effects of this disease."

Results of the AFFIRM Monotherapy Trial

AFFIRM is a two-year, randomized, multi-center, placebo-controlled, double-blind study of 942 patients conducted in 99 sites worldwide, in which patients were randomized to receive either a fixed 300 mg IV infusion dose of TYSABRI (n=627) or placebo (n=315) every four weeks. TYSABRI reduced the rate of clinical relapses by 66 percent relative to placebo (p<0.001), the primary endpoint at one-year. The annualized relapse rate was 0.25 for TYSABRI-treated patients versus 0.74 for placebo-treated patients.

AFFIRM also met all one-year secondary endpoints, including MRI measures. In the TYSABRI-treated group, 60 percent of patients developed no new or newly enlarging T2 hyperintense lesions compared to 22 percent of placebo-treated patients (p<0.001). On the one-year MRI scan, 96 percent of TYSABRI-treated patients had no gadolinium enhancing lesions compared to 68 percent of placebo-treated patients (p<0.001). The proportion of patients who remained relapse free was 76 percent in the TYSABRI-treated group compared to 53 percent in the placebo-treated group (p<0.001).

Results of SENTINEL Add-on Study

Approval was also based on the results of another Phase III clinical trial, SENTINEL. SENTINEL is a two-year, randomized, multi-center, placebo-controlled, double-blind study of 1,171 AVONEX-treated patients in 123 clinical trial sites worldwide.
In the SENTINEL trial, AVONEX-treated patients who continued to experience disease activity were randomized to add TYSABRI (n=589) or placebo (n=582) to their standard regimen.

SENTINEL achieved its one-year primary endpoint. The addition of TYSABRI to AVONEX resulted in a 54 percent reduction in the rate of clinical relapses over the effect of AVONEX alone (p<0.001). The annualized relapse rate was 0.36 for patients receiving TYSABRI when added to AVONEX versus 0.78 with AVONEX plus placebo. SENTINEL also met all secondary endpoints, including MRI measures. In the group treated with TYSABRI plus AVONEX, 67 percent of patients developed no new or newly enlarging T2 hyperintense lesions compared to 40 percent in the AVONEX plus

placebo group (p<0.001). On the one-year MRI scan, 96 percent of TYSABRI plus AVONEX-treated patients had no gadolinium-enhancing lesions compared to 76 percent of AVONEX plus placebo-treated patients (p<0.001). The proportion of patients who remained relapse-free was 67 percent in the TYSABRI plus AVONEX-treated group compared to 46 percent in the AVONEX plus placebo-treated group (p<0.001).

"I believe TYSABRI will be an important therapeutic advance for patients with relapsing MS," said Richard Rudick, MD, lead investigator of the SENTINEL trial and director, Mellen Center for Multiple Sclerosis, Cleveland Clinic Foundation. "Patients who have discontinued therapy, are newly diagnosed with MS, or have persistent active disease despite being on a current therapy will benefit from TYSABRI." Safety Common adverse events associated with TYSABRI include headache, fatigue, urinary tract infection, depression, lower respiratory tract infection, joint pain and abdominal discomfort. The rate of infection in both studies was approximately one per patient-year in both TYSABRI-treated patients and placebo-treated patients. Serious infections occurred in 1.3 percent of placebo-treated patients and 2.1 percent of TYSABRI-treated patients.

Serious infections included bacterial infections such as pneumonia and urinary tract infection, which responded appropriately to antibiotics. TYSABRI has been associated with hypersensitivity reactions, including serious systemic reactions, which occurred at an incidence of less than 1 percent of patients.

Immunogenicity.

All biologies have the potential to induce patient antibodies. Analysis of the one-year Phase III MS trials indicate a low level of immunogenicity associated with TYSABRI. Patients were tested for antibodies ever 12 weeks in the AFFIRM and SENTINEL trials. Antibodies were detected in approximately 10 percent of patients at least once during treatment, with 6 percent of patients remaining persistently positive. Persistently positive antibodies were associated with a substantial decrease in efficacy and an increase in certain infusion-related adverse events. Almost all patients who tested positive for antibodies did so within the first 12 weeks of treatment.

Two-year Results

-21-

AFFIRM and SENTINEL are two-year trials. Two-year results are anticipated beginning in the first half of 2005. Patients who complete these trials are eligible for enrollment in a long-term safety extension study.

"The MS community is pleased that the FDA approval of TYSABRI provides an additional treatment option for people with relapsing forms of MS. There are many people living with MS who may benefit from this different treatment approach," said Stephen C. Reingold, PhD, vice president for research, the National MS Society.

42.     The statements set forth in ¶41 above were materially false and misleading (and Defendants new or recklessly disregarded that they were materially false and misleading), because they failed to disclose the following:

a)      animal and human studies of Tysabri showed a significant risk of negative effects resulting from suppression of the immune system;

b)      the clinical trials of Tysabri failed to include the full range of medical tests required to detect the type of adverse side effects likely to result from extended treatment with Tysabri, including PML; and

d)      The adverse side effects of Tysabri, including PML, were cumulative such that there was a significant possibility that they would not become apparent after a year or even two years of clinical trials.

43.     On December 21, 2004 Elan issued a press release with the headline "Biogen Idec and Elan Announce Head-to-head Study Comparing Safety and Efficacy of Tysabri® to Rebif." Therein, the Company stated:

Biogen Idec and Elan announced today that they are initiating a head-to-head study comparing the safety and efficacy of TYSABRI®

(natalizumab) to Rebif® (Interferon beta-la)*. STARS (Study of TYSABRI Against Rebif in relapsing multiple Sclerosis), is a randomized, assessor-blinded, parallel group study that will enroll more than 1,000 multiple sclerosis (MS) patients in North and South America, Europe, Australia, Turkey and Israel.

Patients who enroll in the study will be randomized to either treatment on Rebif, administered subcutaneously at 44 meg three times per week, or treatment with TYSABRI, administered as a 300 mg IV infusion once every four weeks. The primary endpoint will compare the effect of TYSABRI to Rebif on the rate of clinical relapses. Secondary endpoints include analysis of the proportion of patients remaining relapse free, MRI brain scans, safety, tolerability and quality of life. To help insure the objectivity of data emerging from STARS, relapses will be assessed and determined in a blinded fashion by an independent panel of experienced neurologists who are not participants in the study. The companies expect to enroll the first patient in STARS in the first quarter of 2005.

*

"TYSABRI has shown very encouraging efficacy results and a favorable safety profile after one year, both as a monotherapy and as an add-on therapy to AVONEX® (interferon beta-la)," said Ludwig Kappos, MD, professor of neurology, Basel University, Switzerland, and member of STARS independent panel." "This head-to-head comparison with Rebif will provide important information that will further assist patients and physicians in making therapeutic choices."

44.     To the extent that defendants' statements set forth above in ¶¶ 42 and 43 regarding the efficacy, safety and likely market success of Tysabri are deemed to be forward-looking, they are not protected by the safe harbor provisions of the Private Securities Litigation Reform Act ("PSLRA") because:

a)      Such statements were material to investors;

b)      Defendants had actual knowledge that such statements were false because, in light of the then-existing knowledge with respect to Tysabri, there was no reasonable basis for their statements with respect to Tysabri's potential as an

MS therapy;

c)      Such statements were not accompanied by "meaningful cautionary language"

and

d)      Defendants failed to identify studies containing information about Tysabri

that identified material risks that Elan omitted to disclose.

## Elan and Biogen Learn That Tysabri's Dangers Have Manifested Themselves in Trial Subjects

45.     On February 7, 2005, Dr. Daniel Pelletier, a neurologist at the University of

California, San Francisco, had a Tysabri trial subject admitted to the hospital with weakness on one

side, slurred speech and cognitive impairment. While other neurologists said the symptoms could

be caused by multiple sclerosis, Pelletier said they were not typical of the MS symptoms the patient

had previously manifested. Pelletier said he immediately informed Biogen, which as a matter of

practice, would have immediately informed Elan. However, Biogen and Elan did not at that time,

or for three weeks thereafter, disclose the incident to the investing public.

46.     On February 8, 2005, Defendants issued a news release in which they announced

Elan's Financial results for the fourth quarter and year ended December 31, 2005, provided updated

guidance, and highlighted the purportedly successful Tysabri launch. The release stated, in relevant

part, as follows:

> Commenting on Elan's business, Kelly Martin, Elan's president and
> chief executive officer, said, "2004 was an extraordinary year for
> Elan, with two Elan innovations, Tysabri for multiple sclerosis and
> Prialt for severe chronic pain, approved in the US, with both therapies
> advancing in the regulatory process in Europe. For 2005, we look
> forward to continued growth across the Tysabri franchise, working
> with our collaborator Biogen Idec; continued clinical progress in the
> Alzheimer's immunotherapy programme in collaboration with

-24-

Wyeth; ongoing advancements in our strategic pipeline; and disciplined investment aligned to our core therapeutic areas of autoimmune diseases and neurodegenerative diseases. Our company and our people remain steadfastly focused on our commitment to discover and deliver novel therapeutic approaches for patients with significant unmet medical needs – and to bring sustainable growth and value creation to our shareholders."

Commenting on Elan's fourth quarter and year-end 2004 financial results, Shane Cooke, executive vice president and chief financial officers, said, "2004 has proven to be a transitional year for Elan; we reduced losses by 33% to $0.96 per share; experienced double digit growth in revenues from our remaining business; completed the repositioning of our business and balance sheet with continued disciplined and focused investment in our core therapeutic areas; expanded our organization in targeted areas by recruitment of key talent to execute the successful launch of Tysabri and Prialt; and we significantly strengthened our financial position completing a $1 billion plus bond offering. While it is early days, the initial take-up since launch of Tysabri is exceeding all our expectations and we remain optimistic that we will return to profitability by the end of 2006."

47.    Defendants provided guidance as follows:

Elan is providing guidance as to the potential financial outcome for 2005, excluding the impact of potential revenues from Tysabri and the impact of expensing stock options. Tysabri was approved in the U.S. as a treatment for all forms of relapsing remitting MS in late November 2004. While Elan expects Tysabri to become the market leader in this indication it is too early in the launch to give revenue guidance for this product. However, on the basis of the initial take-up, Elan is optimistic of a return to profitability by the end of 2006.

In relation to the remaining business Elan expects revenues to grow at a rate of 15% to 20% to $460.0 million to $490.0 million and intends to hold SG&A (excluding SG&A related to Tysabri) and R&D costs, on a cash basis, at their 2004 levels. While Elan aims to hold these costs constant in 2005, the allocation of costs between projects will change to reflect primarily the launch of Prialt and the progress of the Alzheimer's research programmes through the clinic.

The gross profit on product revenue, excluding revenue and related cost of sales for Tysabri and stock option compensation, is expected to be in the range of 53% to 57%. Elan will record all of the U.S. sales of Tysabri in revenue and will share the gross profit with Biogen Idec. Elan's gross profit on Tysabri revenue is expected to be in the range of 30% to 35%.

Elan's investment in SG&A expenses for Tysabri for 2005 in respect of all indications, and including pre-launch costs associated with Tysabri for Crohn's disease in both Europe and U.S. and for MS in Europe, are anticipated to be in the $160.0 million to $180.0 million range.

48.     The statements set forth in ¶¶ 46 and 47 above were materially false and misleading

(and Defendants knew or recklessly disregarded that they were materially false and misleading),

because they failed to disclose the following:

a)      animal and human studies of Tysabri showed a significant risk of adverse effects resulting from suppression of the immune system;

b)      the clinical trials of Tysabri failed to include the full range of medical tests required to detect the type of adverse effects likely to result from extended treatment with Tysabri, including PML; and

c)      the adverse side effects of Tysabri, including PML, were cumulative such that there was a significant possibility that they would not become apparent after a year or even two years of clinical trials; and

d)      Defendants' guidance lacked any reasonable basis in fact.

49.     To the extent that the defendants' statements set forth above in ¶¶ 46 and 47 regarding

the efficacy, safety and likely market success of Tysabri are deemed to be forward-looking, they are

not protected by the safe harbor provisions of the Private Securities Litigation Reform Act

("PSLRA") because:

a) Such statements were material to investors;

b) Defendants had actual knowledge that such statements were false because, in light of the then-existing knowledge with respect to Tysabri, there was no reasonable basis for their statements with respect to Tysabri's potential as a MS therapy;

c) Such statements were not accompanied by "meaningful cautionary language" and

d) Defendants failed to identify studies containing information about Tysabri that identified material risks that Elan omitted to disclose.

50. On February 17, 2005, Defendants announced the results of the two-year "monotherapy" trial of Tysabri (i.e. Tysabri without Avonex) and claimed that it demonstrated that Tysabri has a "significant impact on disability progression and Relapse Rate in Multiple Sclerosis and that the adverse event trial was "consistent with previous results." The release stated, in relevant part, as follows:

> Biogen Idec (NASDAQ: BIIB - News) and Elan Corporation, plc (NYSE: ELN - News) announced today that the Phase III TYSABRI® (natalizumab) AFFIRM monotherapy trial achieved the two-year primary endpoint of slowing the progression of disability in patients with relapsing forms of multiple sclerosis (MS). TYSABRI treatment led to a 42 percent reduction in the risk of disability progression related to placebo. These data also demonstrated a 67 percent reduction in the rate of clinical relapses over two years, which was sustained and consistent with the previously reported one-year results.
>
> Other data from AFFIRM at two years, including MRI measures and immunogenicity were similar to previously reported results.

*The adverse event profile at two years was also consistent with previously reported results. Common events included headache, fatigue, urinary tract infection, depression, lower respiratory tract infection, limb and joint pain, and pharyngitis. The incidence of infections in TYSABRI-treated and placebo-treated patients was similar. Serious infections occurred in 3.2 percent and 2.6 percent of patients, respectively. These included bacterial infections such as pneumonia and urinary tract infection, which responded appropriately to antibiotics. TYSABRI has also been associated with hypersensitivity reactions, including serious systemic reactions that occurred at an incidence of less than 1 percent of patients.*

*"TYSABRI, with its significant effect on slowing the progression of disability, offers new hope for patients with MS," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "With these data, we gain a more complete understanding of the broad therapeutic benefit of TYSABRI in MS."*

"Results from the two-year monotherapy clinical trial mark a major milestone in the treatment of MS. *These two-year data strengthen our belief that TYSABRI will become the leading therapy for MS patients,*" said Lars Ekman, MD, executive vice president and president, Research and Development, Elan.

AFFIRM is a two-year, randomized, multi-center, placebo-controlled, double-blind study of 942 patients conducted in 99 sites worldwide, evaluating the effect of TYSABRI on the progression of disability as measured by the Expanded Disability Status Scale (EDSS) and the rate of clinical relapses. Patients were randomized to receive either a 300 mg IV infusion dose of TYSABRI (n=627) or placebo (n=315) every four weeks.

Based on one-year data from AFFIRM and the SENTINEL add-on trial with AVONEX® (Interferon beta-la), the U.S. Food and Drug Administration (FDA) granted Accelerated Approval for TYSABRI on November 23, 2004, as a treatment for relapsing forms of MS.

The companies anticipate that two-year data from the AFFIRM trial will be presented at the American Academy of Neurology (AAN) meeting in April 2005. The companies expect two-year results from the SENTINEL trial will be available mid-year. Two-year data from both studies will also be submitted to regulatory authorities. [Emphasis added.]

-28-

51.     The statements set forth in ¶50 above were materially false and misleading (and Defendants knew or recklessly disregarded that they were materially false and misleading), because they failed to disclose the following:

a)     animal and human studies of Tysabri showed a significant risk of adverse effects resulting from suppression of the immune system;

b)     the clinical trials of Tysabri failed to include the full range of medical tests required to detect the type of adverse side effects likely to result from extended treatment with Tysabri, including PML; and

c)     the adverse side effects of Tysabri, including PML, were cumulative such that there was a significant possibility that they would not become apparent after a year or even two years of clinical trials;

d)     a SENTINEL clinical trial subject had been admitted to the hospital with symptoms consistent with PML; and

e)     Defendants' guidance lacked any reasonable basis in fact.

52.     To the extent that defendants' statements set forth above in ¶50 regarding the efficacy, safety, and likely market success of Tysabri are deemed to be forward-looking, they are not protected by the safe harbor provisions of the Private Securities Litigation Reform Act ("PSLRA") because:

a)     Such statements were material to investors;

b)     Defendants had actual knowledge that such statements were false because, in light of the then-existing knowledge with respect to Tysabri, there was no reasonable basis for their statements with respect to Tysabri's potential as a MS therapy;

c)     Such statements were not accompanied by "meaningful cautionary language" and

d)     Defendants failed to identify studies containing information about Tysabri that identified material risks that Elan omitted to disclose.

53.     The next day, February 18, 2005, Elan and Biogen notified the FDA that one patient had contracted PML and that another patient was suspected of having contacted it. The two patients were among about 500 in the SENTINEL clinical trial looking at how Tysabri worked with Avonex. They had received the drug combination for more than two years. Elan and Biogen did not disclose the two adverse incidents until February 28, 2005.

## THE TRUTH BEGINS TO EMERGE

54.     On February 28, 2005, before the market opened, Defendants disclosed that one patient who had been receiving Tysabri for 38 months as part of a clinical trial of Tysabri had died, that another patient, who had been taking Tysabri for 27 months was seriously ill and that, as a consequence, they were voluntarily suspending sales of Tysabri. Elan issued the following press release:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today a voluntary suspension in the marketing of TYSABRI® (natalizumab), a treatment for multiple sclerosis (MS). The companies are suspending supply of TYSABRI from commercial distribution and physicians should suspend dosing of TYSABRI until further notification. In addition, the companies have suspended dosing in all clinical trials.
>
> Their decision is based on very recent reports of two serious adverse events that have occurred in patients treated with TYSABRI in combination with AVONEX® (Interferon beta-la) in clinical trials. These events involve on fatal, confirmed case and one suspected case of progressive multifocal leukoencephalopathy (PML), a rare and

frequently fatal, demyelinating disease of the central nervous system. Both patients received more than two years of TYSABRI therapy in combination with AVONEX.

The companies' actions have been taken in consultation with U.S. Food and Drug Administration (FDA). Worldwide regulatory agencies are being kept informed.

The companies will work with clinical investigators to evaluate TYSABRI-treated patients and will consult with leading experts to better understand the possible risk of PML. The outcome of these evaluations will be used to determine possible re-initiation of dosing in clinical trials and future commercial availability.

"Our ongoing commitment to MS patients has led us to take these steps," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "Because we believe in the promising therapeutic benefit of TYSABRI, we are working to evaluate this situation thoroughly and expeditiously. While we work through this matter, we must place patient safety above all other considerations."

"We are working with leading experts and regulatory agencies to responsibly investigate these events and to develop the appropriate path forward," said Lars Ekman, MD, executive vice president and president, Research and Development, Elan." "Our primary concern is for the safety of patients."

In total, approximately 3,000 patients have been treated with TYSABRI in clinical trials of MS, Crohn's disease, and rheumatoid arthritis. To date, the companies have received no reports of PML in MS patients receiving TYSABRI monotherapy or in patients with Crohn's disease or rheumatoid arthritis in TYSABRI clinical trials. Biogen Idec has received no reports of PML in patients treated with AVONEX alone, a product that has been on the market since 1996.

55.     News of this shocked the market. Shares of Elan fell $18.90 per share, or 70.26 percent, to close at $8.00 on unusually high trading volume.

56.     On March 1, 2005, The New York Times ran an article from Dublin under the headline "Elan Shares Fall After A Drug Is Withdrawn" in which it described the impact of the

disclosure on Elan:

> To a company that spent three years recovering from a crippling accounting scandal, Tysabri had looked like the ticket to its resurgence.
>
> The Elan Corporation, which developed Tysabri with Biogen Idec, had looked to the drug, a multiple sclerosis treatment, to catapult it into the ranks of the world's top biotechnology companies. Since the drug's introduction in November, Tysabri had shown the patient response, and earnings potential, that would make it a blockbuster.
>
> Instead, Elan's stock plunged 68 percent Monday when the company withdrew Tysabri from the market after a patient's death. Elan shares fell to 6.49 euros ($8.59) in Dublin, and dragged the small Irish stock exchange's benchmark index down 6 percent with it.
>
> "It's a major body-blow for Elan," said Kevin McConnell, head of research for Bloxham Stockbrokers in Dublin. "The question is, will we see Tysabri back?" [...]
>
> Elan's current portfolio in the United States includes just three products – two intravenous antibiotics and a newly approved treatment for chronic pain. For several years, Elan has conducted research into Alzheimer's disease in a partnership with Wyeth, but that is far from yielding a marketable treatment.
>
> That near-death experience humbled a company that had previously dominated the Irish stock exchange.
>
> Before Tysabri's withdrawal, Elan was the fourth-largest company traded in Dublin by market capitalization, representing more than 9 percent of the value of the whole exchange; it fell to around 3 percent on Monday.
>
> The steep tumble in its shares "has a huge psychological impact, but people quickly realize that it's not an economic story," Mr. McConnell said.

57.     In a separate article in *The New York Times*, appearing the same day, a leading expert

on Tysabri stated that no one should have been surprised that patients being treated with Tysabri

would contract PML. In this regard, the article stated, in relevant part:

> Lawrence Steinman, a professor of neurology and head of immunology at Stanford, said the F.D.A. should not have approved the drug on the basis of only one year's data. He said the risk of serious infections like P.M.L. was "unfortunately logical" given that Tysabri works by interfering with the immune system.
>
> "I'm shocked that it happened so soon, but I knew it was going to happen sooner or later," said Professor Steinman, who participated in an early animal study that led to the development of Tysabri. Dr. Steinman is a co-founder and director of Bayhill Therapeutics, a company developing competing drugs for multiple sclerosis.
>
> *Dr. Steinman said he had expressed his apprehensions about the drug in speeches and in an article in the journal Science in July and had been asked by Biogen executives to tone down criticism of the drug.*
>
> Officials of Biogen, Elan and the F.D.A. said there was no evidence of an increased risk of serious infections seen in the clinical trials until the recent two cases arose. [Emphasis added.]

58.     Similarly, on March 2, 2005, the *Los Angeles Times* published an article stating, in

relevant part, as follows:

> Researchers familiar with Tysabri said they weren't surprised to learn that patients had become infected with the deadly virus. Emmanuelle Waubant, a neurologist at UC San Francisco, said PML didn't show up in the one-year data because such infections take long to develop.
>
> "In patients with HIV, it takes several years of having their immune system compromised to develop this virus," she said. "It is not surprising it took two years in each [Tysabri] case," she said. "There is a reason why these studies were designed to take two years." [Emphasis added.]

59.     On March 9, 2005, the Lost Angeles Times published an article providing specifics

with respect to the infection rate and adding that FDA officials lacked sufficient information about

Tysabri's long-term effects. The article stated, in relevant part, as follows:

In hundreds of pages of documents that offered the first detailed look at the FDA's handling of the drug, reviewers noted that Tysabri appeared more effective than existing drugs, reducing relapses in patients by 66%, based on one year's data. The reviewers said it was "reasonably likely" that the drug would provide long-term benefits.

*Nonetheless, the agency's drug reviewers acknowledged they were unsure about Tysabri's long-term effects.*

"The clinical meaningfulness of a decrease in the incidence of relapses at one year is uncertain," the reviewers wrote.

*FDA reviewers found that Tysabri had an acceptable safety profile, though they noted that health risks "beyond one year are not known."*

Infections, including urinary and respiratory, were seen with Tysabri, but they were "generally routine and did not have a complicated course," the reviewers said.

Stanford University professor Dr. Lawrence Steinman, an MS specialist, had warned there was a clear risk of infection for patients taking such drugs, because they tend to suppress the body's immune system.

Steinman had helped discover the active agents in the drug, but later became concerned about potential side effects, and is working on a competing drug. *He noted that the infection rate of Tysabri patients in one trial was 2.1% compared with 1.3% in the placebo group.*

"There were hints of an increase in the infection rate," said Steinman. "The FDA should have dug deeper." [Emphasis added.]

60. On March 30, 2005, after the close of the market, the truth continued to emerge as Elan issued the following press release:

DUBLIN, Ireland and CAMBRIDGE, Mass. – (BUSINESS WIRE) – March 30, 2005 – Elan Corporation, plc (NYSE: ELN - News) and Biogen Idec (NASDAQ: BIIB - News) announced today that their ongoing safety evaluation of TYSABRI® (natalizumab) has led to a previously diagnosed case of malignant astrocytoma being reassessed as progressive multifocal leukoencephalopathy (PML), in a patient in an open label Crohn's disease clinical trial.

-34-

In light of the two previously reported cases of PML in multiple sclerosis clinical trials, Elan and Biogen Idec initiated an additional comprehensive safety evaluation of TYSABRI clinical trial patients. In the course of this safety review, the companies identified a case warranting reassessment in an open label Crohn's disease clinical trial. In July 2003, the case was reported by a clinical trial investigator as malignant astrocytoma. This diagnosis was confirmed at the time by histopathology. The patient died in December 2003.

As part of this ongoing safety review, the companies, in agreement with the clinical trial investigator, reassessed the case. Following this additional evaluation, the diagnosis is being reassessed as PML. The patient had received 8 doses of TYSABRI over an 18 month period and prior medication history included multiple courses of immunosuppressant agents.

61.     This news further shocked the market, triggering an additional 51% price drop, from $6.98 at the March 30th market close to $3.41 in after hours trading, revealing that Elan's prior announcements had been merely half-truths, and Elan securities continued to substantially lose value.

## LOSS CAUSATION ALLEGATIONS

62.     Elan's common stock was traded on the London and Dublin stock exchanges and its ADRs traded on the NYSE at all relevant times. As described *supra*, Defendants' material misrepresentations and omissions had the effect of creating and maintaining an artificially inflated price for Elan's securities. Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting the false public perception of Elan and Tysabri.

63.     Defendants had a duty to promptly disseminate accurate and truthful information with respect to Elan's financial and operational condition or to cause and direct that such information be disseminated and to promptly correct any previously disseminated information that was misleading

-35-

to the market. As a result of their failure to do so, the price of Elan's stock was artificially inflated during the Class Period, damaging Plaintiffs and the Class.

64.     Defendants' false and misleading statements and omissions in their press releases and other public statements directly caused losses to the Class. On the strength of these false statements, misrepresentations and material omissions in its press releases, announcements and other public statements concerning its financial condition, the Company's ADRs were artificially inflated to a Class Period high of $30.45 per share on November 15, 2004, and remained artificially inflated until the end of the Class Period. Thereafter, the ADRs fell to $7.90 on February 28, 2005, and down to $3.41 on March 30, 2005, all of these drops being attributable only to the truth becoming known, thereby inflicting substantial damages on the Plaintiff and the Class.

65.     Until shortly before Plaintiffs filed this Complaint, they were unaware of all of the facts, as described herein, and could not have reasonably discovered the Defendants' fraudulent scheme earlier by exercise of reasonable diligence.

## DEFENDANTS ACTED WITH SCIENTER

66.     Each misrepresentation and/or omission of material fact alleged herein was made with reckless disregard for, or knowledge of its false and misleading nature. At all relevant times, each defendant knew the material facts about Tysabri's risks and side effects, and the impact such side-effects could have on the Company and the Company's sale of Tysabri. Thus, the misrepresentations and omissions complained of herein were made with the Defendants' knowledge, or with deliberate recklessness.

67.     The Individual Defendants had the opportunity to commit and participate in the fraud described herein. The Individual Defendants were executive officers of Elan, and thus controlled

-36-

the Company's press releases, corporate reports, SEC filings and communications with analysts.

68.     Defendants had the motive to commit and participate in the fraud. During the years preceding the Class Period, the Company had faced substantial setbacks resulting in the divestiture of billions of dollars of assets. Defendants were relying heavily upon sales of Tysabri to turn the Company around, and increase revenue and earnings.

69.     As set forth above, Defendants were on notice at all times during the Class Period about the class-wide deleterious and dangerous effects of Tysabri. Thus, Defendants knew or recklessly disregarded the negative facts alleged herein at all relevant times. Nevertheless, Defendants acted to suppress and conceal the truth about Tysabri from consumers and from investors, and actively misrepresented the safety of these products throughout the Class Period.

70.     Defendants' scienter is also evidenced by Elan's sale of $1.5 billion in senior notes during the Class Period.

## FRAUD ON THE MARKET ALLEGATIONS

71.     At all relevant times, the market for Elan common stock was an efficient market for the following reasons, among others:

> a)     At all relevant times during the Class Period, Elan's ADRs were listed and actively traded on the NYSE, a highly efficient National Market, with approximately 386,182,274 shares of common stock issued and outstanding.

> b)     As a registered and regulated issuer of securities, Elan filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint.

72.     As a result of the above, the market for Elan securities promptly digested current

-37-

information with respect to the Company from all publicly available sources and reflected such information in the securities' prices. Under these circumstances, all purchasers of Elan securities during the Class Period suffered similar injury through their purchase of securities at prices which were artificially inflated by the Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

73.     The statutory safe harbor for certain forward-looking statements does not apply to the misrepresentations and omissions alleged in this complaint. Many of the statements were not specifically identified as "forward-looking statements" when made. To the extent that there were any properly identified forward-looking statements, there was no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable nonetheless because at the time each of the misrepresentations was made, the particular speaker(s) knew that the statement was false or misleading at that time.

74.     Any warnings or other cautionary language contained in the press releases and other public statements described herein were generic, "boilerplate" statements of risk that would affect any similar company, and misleadingly contained no factual disclosure of any of the problems with the Company which placed the ability of the Company to accurately depict its own financial situation into serious question. As such, any forward-looking statements complained of herein were not accompanied by meaningful cautionary language.

75.     Any relevant purported risk disclosures, were, in fact, false and misleading in and of

themselves, by virtue of the fact that the events which the risk disclosures purported to warn against
as contingencies had frequently already become a reality or a certainty.

## COUNT I

### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated
### Thereunder Against All Defendants

76.     Plaintiffs incorporate by reference and realleges all preceding paragraphs as
though fully set forth herein.

77.     During the Class Period, Defendants engaged in a plan, scheme and course of
business which operated as a fraud upon Plaintiffs and other Class Members, and made various
untrue statements of material fact and omitted to state material facts necessary to make the
statements made, in light of the circumstances under which they were made, not misleading to
Plaintiffs and other Class Members as set forth above.  The purpose and effect of this scheme
was to induce Plaintiffs and the other members of the Class to purchase the Company's securities
during the Class Period at artificially inflated prices.

78.     By reason of the foregoing, Defendants knowingly or recklessly violated § 10(b)
of the Exchange Act and Rule 10b-5 promulgated thereunder in that they themselves or a person
whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue
statements of material facts or omitted to state material facts necessary in order to make the
statements made, in light of the circumstances under which they were made, not misleading; or
(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon
Plaintiffs and other members of the Class in connection with their purchases of the Company's
common stock during the Class Period.

79.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations described above, Plaintiffs and other members of the Class relied, to their detriment, directly on the misstatements or the integrity of the market both as to price and as to whether to purchase these securities. Plaintiffs and other members of the Class would not have purchased Elan securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements and omissions. At the time of the purchase of Elan securities by Plaintiffs and the other members of the Class, the fair market value of said securities was substantially less than the prices paid. Plaintiffs and the other members of the Class have suffered substantial damages as a result.

## COUNT II

### Violations of § 20(a) of the Exchange Act Against the Individual Defendants

80.    Plaintiffs incorporate by reference and realleges all preceding paragraphs as though fully set forth herein.

81.    The Individual Defendants acted as controlling persons of Elan within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

-40-

statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.     As set forth above, Elan and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a)      Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiff and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

b)      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial,

-41-

including interest thereon;

c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

e)    Such other and further relief as the Court may deem just and proper.

### **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: April 21, 2005

Respectfully Submitted,

Attorney for Plaintiff

Clinton A. Krislov
Jason P. Stiehl
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker Dr., Suite 1350
Civic Opera House
Chicago, Illinois 60606
312-606-0500
Firm I.D. No. 91198

## CERTIFICATION OF PLAINTIFF

I, Robert Hunt, individually certify that:

1.      I did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities law.

2.      I am willing to serve as a Lead Plaintiff either individually or as part of a group. A Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action and whose duties may include providing testimony at deposition and trial, if necessary.

3.      I represent and warrant that I am authorized to execute this Certification on behalf of the purchasers of the securities described herein (including, as the case may be, myself, co-owners, any corporations or other entities, and/or any beneficial owners).

4.      I will not accept any payment for serving as a representative party on behalf of the class beyond the purchaser's *pro rata* share of any recovery except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

5.      I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party or Lead Plaintiff.

6.      The number of shares of other securities of Elan Corp., plc (NYSE: ELN) I held on the first day of the Class Period, if any, are set forth in the attached Schedule A.

7.      All of my transactions in the securities of Elan Corp., plc during the Class Period are listed on the attached Schedule A.

8.      The details of my sales of securities of Elan Corp., plc during the **90-day period after** the Class Period are set forth in the attached Schedule A.

9.      During the three years prior to the date of this Certification, I have not sought to serve and I have not served as a representative party for a class in an action filed under the federal securities laws except as described below (if any):

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Execute this _ / 7 _ day of April 2005.


_____
                Robert Hunt

## Schedule A

**Purchase(s)**

| Date | Shares | Price |
|------|--------|-------|
| 3/7/2005 | 1,000 | 7.95 |
| 3/9/2005 | 1,000 | 5.75 |

**Sale(s)**

None